DocuSign Envelope ID: 08CF5F5A-967F-4345-93E5-DA52A97CCB12

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(CENTRAL DIVISION)

| | |
|---|---|
| In re:<br><br>**SOLAR WOLF ENERGY, INC.,**<br><br>Debtor. | Chapter 7<br>Case No. 22-40693-CJP |

**STIPULATION OF SETTLEMENT BETWEEN JOSEPH H. BALDIGA,
CHAPTER 7 TRUSTEE, AND SUNPOWER CORPORATION**

Joseph H. Baldiga, the Chapter 7 trustee (the "Trustee") of the bankruptcy estate (the "Estate") of Solar Wolf Energy, Inc. (the "Debtor"), and SunPower Corporation acting for itself and its affiliates ("SunPower") hereby enter into the following Stipulation of Settlement (the "Stipulation"). The Trustee and SunPower are together referred to herein as the "Parties."

**PRELIMINARY STATEMENT**

This Stipulation is for the purpose of documenting the resolution of claims and potential claims arising from the pre-petition business relationship between the Debtor and SunPower. As set forth more fully below, the Stipulation reflects:

- the Trustee's investigation and assessment of the pre-petition business relationship between the Debtor and SunPower;

- a payment of $35,000 by SunPower to the Trustee for certain equipment of the Debtor transferred to SunPower pre-petition;

- a proposed SunPower program in conjunction with the Massachusetts Clean Energy Center ("Mass CEC") to assist certain residential homeowners that contracted with the Debtor for residential solar projects under the Mass CEC "Solarize Yarmouth Program". The assistance program would involve a contribution by SunPower and Mass CEC described further below to give eligible homeowners an option to complete projects that were not completed when the Debtor ceased business operations; and

{Client Matter 15008/14399/A8222155.DOCX[Ver:2]}

- mutual releases of claims the Parties have or could have otherwise asserted in these proceedings.

## BACKGROUND

**A.  The Bankruptcy Case.**

1.  Prior to September 23, 2022 (the "Petition Date"), the Debtor was engaged in the solar power sales, installation and servicing business.

2.  The Debtor ceased its business operations in or about May 2022.

3.  On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

4.  On September 26, 2022, the United States Trustee appointed Joseph H. Baldiga Chapter 7 trustee of this case, and he continues to serve as such.

**B.  The Parties' Pre-Petition Contracts.**

5.  SunPower was one of the Debtor's suppliers and transaction partners prior to the Petition Date.

6.  The Parties' business relationship was evidenced by: (a) a Dealer Participation Agreement (in which the Debtor originated contracts and installed equipment for customers that would become customers of SunPower); (b) a Residential Dealer Agreement (in which the Debtor could purchase SunPower panels and related equipment from SunPower for customers of the Debtor and customers' contractual relationship would remain with the Debtor); and (c) an Installation Partner Agreement (in which the Debtor would act as a subcontractor for SunPower and install panels and related equipment for SunPower customers) (each a "Contract", collectively, the "Contracts").

7.  SunPower terminated the Dealer Participation Agreement in April 2022. SunPower did not thereafter request further services from the Debtor under the Installation Partner Agreement. The Debtor did not thereafter seek to purchase equipment under the Residential Dealer Agreement.

8.  The Debtor's Schedules and Statement of Financial Affairs in these proceedings, as amended, listed potential claims against SunPower for breach of one or more of the Contracts with a stated value of "unknown" (the "Breach Issues"). See Dkt. No. 121. SunPower disputes that any breach of contract claims exist against SunPower under any Contract.

## C.   **Return of Equipment.**

9.  Prior to the Petition Date, after the Debtor ceased business operations, the Debtor and SunPower coordinated the return to SunPower of solar panels, rails, batteries and assorted related items (the "Retrieved Property") from the Debtor's premises in Auburn, Massachusetts. An inventory of the Retrieved Property is attached hereto as **Exhibit A**. Under the terms of the Dealer Participation Agreement and the Installation Partner Agreement, equipment relating to both of these contracts at the Debtor's premises was owned by SunPower and not the Debtor. The recovery of the Retrieved Property was coordinated by the Debtor and SunPower (including respective counsel) and representatives of the Debtor helped to segregate the equipment to be recovered by SunPower. A representative of the Debtor was present when the Retrieved Property was recovered.[1]

## D.   **The Trustee's Investigation and Diligence.**

10. Following his appointment, the Trustee vetted and investigated the Breach Issues as well as matters affecting the Retrieved Property.

---

[1] As part of this same process the parties reconciled accounts receivable owed by SunPower to the Debtor and SunPower remitted the accounts receivable the parties agreed were then owed to the Debtor.

11. SunPower disputes any assertion that SunPower committed any material breach of any of the Contracts and the Trustee concluded from his investigation that any breach of contract claims based on the Contracts are likely meritless. The Trustee also concluded that no value to the Estate is likely even if such a claim were pursued since the Debtor's pre-petition assets are subject to sizable liens of numerous parties, including the Internal Revenue Service, the Commonwealth of Massachusetts – Department of Revenue, the U.S. Small Business Administration for an unpaid $150,000 COVID-related loan, DLR Inc. and possibly others (collectively, the "Asset Liens"). The Asset Liens would attach to any recovery stemming from breach of contract claims (if any).

12. SunPower also disputes any wrongdoing in connection with its collection of the Retrieved Property. The Trustee asserts that the Estate may have avoidance claims stemming from SunPower's collection of the Retrieved Property, including without limitation claims pursuant to Bankruptcy Code §§ 544, 547 and 548 (collectively, "Avoidance Claims"). As part of the Parties' review of information in responding to the Trustee's investigation of matters affecting Retrieved Property, SunPower determined and disclosed to the Trustee that approximately 19 panels apparently owned by the Debtor (with a "dealer price" of approximately $8,500) were comingled with and included in the Retrieved Property (such equipment, "SW Property"). SunPower also determined and disclosed to the Trustee that some additional amount of the Retrieved Property might also be SW Property. The Parties have disputed the extent to which Retrieved Property included SW Property beyond the 19 panels referenced above given, among other factors, the Debtor's participation in segregating the Retrieved Property when it was recovered, the Debtor's consent in SunPower's recovery of the Retrieved Property, and the available records concerning equipment SunPower expected to recover. The Parties have also

4

disputed the fair market value of any Retrieved Property that might be SW Property (vs. the "dealer price"), as well as the effective amounts that could have been recovered by the Estate for any SW Property had it remained with the Debtor given holding and disposition costs the Estate would have incurred. SunPower has asserted that given these and similar issues any exposure by SunPower for issues regarding Retrieved Property beyond the 19 panels are de minimis. SunPower has disclosed to the Trustee that at most, net of offsets for missing equipment, the aggregate "dealer price" of such property, including the 19 panels, would be approximately $60,000.

13. The Debtor's Statement of Financial Affairs, as amended, in response to Question 5, the Debtor ascribed a value of $53,027.72 to the SW Property. See Dkt. No. 121. The Trustee believes this is actually a reference to accounts receivable the Debtor previously claimed from SunPower for installations performed by the Debtor under the Contracts (as noted above, however, SunPower and the Debtor resolved and SunPower paid accounts receivable owed to the Debtor before the Petition Date).

E.   **Solarize Yarmouth Program.**

14. SunPower and the Trustee have discussed matters relating to the Debtor's pre-petition participation in the Solarize Yarmouth Program managed by the Mass CEC. The Debtor was selected as an installation company for the Solarize Yarmouth Program, and contracted with residential participants in the Solarize Yarmouth Program to install residential solar systems that were intended to include equipment supplied by SunPower (the "Customers").

15. Prior to the Petition Date, the Debtor accepted deposits or partial payments from certain Customers that were waiting for projects to commence or were left with incomplete projects when the Debtor ceased operations in or about May 2022 (the "Affected Customers").

16. Together, the Mass CEC and SunPower are investigating the possibility of assisting Affected Customers that desire to complete the residential solar systems that were contracted with the Debtor under the Solarize Yarmouth Program. Affected Customers would be given an option to contract with SunPower to install (or complete) a residential solar system comparable to the one promised by the Debtor (the "Yarmouth Assistance Program"). Affected Customers that opt to participate in the Yarmouth Assistance Program would receive a full credit for deposits or partial payments previously paid to the Debtor, and will be given an opportunity to complete their projects by payment of the outstanding balance that would have been due under their contract with the Debtor. Mass CEC and SunPower would subsidize the completion of these projects through equipment and payment of installation costs that would have otherwise been covered by such Customer's deposits or partial payments to the Debtor.

**F.  Agreement to Compromise.**

17. The Parties have engaged in extensive diligence regarding the Contracts and the Retrieved Property, have engaged in extensive negotiations regarding the Avoidance Claims, and have discussed the potential Yarmouth Assistance Program, and now wish to consensually resolve all of the disputes and claims between them as set forth herein.

**STIPULATION**

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, the Parties stipulate and agree as follows:

A.  <u>Settlement Payment</u>. Subject to the entry of an Approval Order as a Final Order (as defined below) SunPower shall pay the sum of $35,000 (the "Settlement Payment") to the Trustee as full settlement and satisfaction of the Avoidance Claims. SunPower shall pay the Settlement Payment within fifteen (15) business days following entry of an Order of the

Bankruptcy Court approving this Stipulation (the "Approval Order") and the Approval Order becoming "final" (i.e., no longer subject to stay, reconsideration or appeal, the "Final Order"). The Settlement Payment shall be made in the form of a certified or bank check (made payable to "Joseph H. Baldiga, Chapter 7 Trustee" and delivered to the Trustee's office located in Westborough, Massachusetts) or by wire transfer.

  B. <u>Yarmouth Assistance Program</u>.  Together with the Mass CEC, SunPower is authorized in its sole discretion (including reasonable contract requirements with Affected Customers) to proceed with the Yarmouth Assistance Program.  SunPower's solicitation of Affected Customers in order to implement the program would not (i) constitute a violation of the automatic stay set forth in Bankruptcy Code § 362 or (ii) give rise to any right or claim of the Estate against SunPower.  Should the program go forward, SunPower would notify the Affected Customers as follows:  (a) under the terms of an agreement with the Trustee in these proceedings to facilitate the Yarmouth Assistance Program, Affected Customers that avail themselves of the Yarmouth Assistance Program will relinquish any claims asserted against the Estate, and (b) Affected Customers with questions regarding this aspect of the Yarmouth Assistance Program may contact the Trustee.  Further, the Trustee and the Estate would relinquish any claim or interest in the receivables purportedly due from any Affected Customers who chose to participate.  SunPower would maintain a list of the Affected Customers who participate in the Yarmouth Assistance Program and would provide same to the Trustee within ten (10) business days of the Trustee's written request.

  C. <u>Release of SunPower</u>.  Effective upon the later to occur of: (i) entry of the Approval Order and the Approval Order becoming the Final Order and (ii) the Trustee's receipt of the Settlement Payment, the Trustee, on behalf of the Estate, will be deemed to have waived

and released SunPower, its representatives, attorneys, agents, and assigns, of and from any and all claims and/or counter-claims, causes of action, suits and liabilities, now, heretofore existing at law or in equity, whether known or unknown, including without limitation claims that were or could have been asserted by the Trustee on behalf of the Debtor or the Estate against SunPower in these proceedings. For the avoidance of doubt, the claims released include without limitation all claims and potential claims arising from the pre-petition business relationship between the Debtor and SunPower, any claims arising out of, or related to, the subject matter of the SW Property, the Avoidance Claims, the Contracts and any alleged breach of the Contracts by SunPower.

D.  Release of Trustee and Estate. Effective upon the later to occur of: (i) entry of the Approval Order and the Approval Order becoming the Final Order and (ii) the Trustee's receipt of the Settlement Payment, SunPower will be deemed to have waived and released the Trustee, his representatives, attorneys, agents, and assigns, and the Estate, of and from any and all claims and/or counter-claims, causes of action, suits and liabilities, now, heretofore existing at law or in equity, whether known or unknown, including without limitation claims arising out of, or related to, the subject matter of the SW Property and the Avoidance Claims. For the avoidance of doubt the foregoing waiver and release include a waiver by SunPower of any and all claims in the Debtor's case, including without limitation any claims against the Estate and the Trustee that might arise from payment of the Settlement Payment.

E.  Bankruptcy Court Approval. Upon receipt of the fully-executed Stipulation, the Trustee will submit this Stipulation to the Bankruptcy Court for approval. The Stipulation is subject to Bankruptcy Court approval pursuant to Fed. R. Bank. P. 9019 and

DocuSign Envelope ID: 08CF5F5A-967F-4345-93E5-DA52A97CCB12

MLBR 9019-1 on terms reasonably acceptable to the Parties. Absent such approval, this Stipulation will be of no force or effect.

[SIGNATURE PAGE FOLLOWS]

{Client Matter 15008/14399/A8222155.DOCX[Ver:2]}

IN WITNESS WHEREOF, the Parties have caused this Stipulation to be executed as of the dates set forth below.

SUNPOWER CORPORATION

By: *Guthrie Dundas*
Name: Guthrie Dundas
Title: Vice President

_____
Joseph H. Baldiga, Chapter 7 Trustee

Dated: 3/30/2023 , 2023

Dated: 4/6/23 , 2023

10

{Client Matter 15008/14399/A8222155.DOCX[Ver:2]}

# EXHIBIT A

## Solar Wolf - Material Return, 7/20/22

| SKU | Description | 1st pass | Notes | 2nd Pass |
|---|---|---|---|---|
| 506608 | ASSY, MID CLAMP, INVISIMOUNT | 837 | | 837 |
| 508012 | ASSY, GROUNDING, RAIL, INVISIMOUNT | 101 | | 101 |
| 510088 | KIT, SPLICE, SCREWS, INVISIMOUNT | 346 | | 346 |
| 511171 | RAIL, INVISIMOUNT, EXTRUSION, 3280MM | 294 | | 294 |
| 513473 | ASSY, CLIP, GROUNDING, ROW, INVISIMOUNT | 111 | | 111 |
| 514902 | LUG, LAY-IN, GROUNDING, WILEY, .266 MOUNTING HOLE, 6GA-14GA WIRE | 45 | | 45 |
| 516990 | KIT, REVENUE GRADE METERING CT, PRODUCTION, PVS OUTDOOR | 3 | | 3 |
| 518636 | ASSY, END CLAMP, INVISIMOUNT | 460 | | 460 |
| 519111 | MODULE ROW SPACER, INVISIMOUNT | 408 | | 408 |
| 526616 | PVM, SPR-X21-335-BLK-E-AC, AR-F1 M5 B2 166A | 19 | | 19 |
| 529027 | MONITORING SYSTEM, R&C, PVS6, 100-240VAC, US | 16 | | 16 |
| 530021 | PVM, SPR-X22-360-E-AC, AR-H1 M5 B1 L 166A | 20 | | 20 |
| 530095 | PVM, SPR-A400-G-AC, AR-F1 M5.2 B1 | 37 | | 37 |
| 530167 | JUNCTION BOX, RAIL MOUNTED, V2, INVISIMOUNT | 2 | | 2 |
| 530168 | JUNCTION BOX, ROOF TRANSITION, COMP SHINGLE, INVISIMOUNT | 5 | | 5 |
| 530206 | PVM, SPR-A410-G-AC, AR-F1 M5.2 B1 | 12 | | 12 |
| 531539 | CLIP, RAIL, CABLE MANAGEMENT, DG CABLE, INVISIMOUNT | 232 | | 232 |
| 531559 | JUNCTION BOX, RAIL MOUNTED, ENPHASE CABLE GLAND, ASSEMBLY, INVISIMOUNT | 3 | | 3 |
| 531766 | ROOF ATTACHMENT, RAFTER, COMP SHINGLE, PEGASUS, BLACK | 72 | | 72 |
| 531967 | CLIP, FRAME, CABLE MANAGEMENT, 0 DEGREE, ENPHASE, EQUINOX | 196 | | 196 |
| 532173 | KIT, METERING, CONSUMPTION, PVS6, UL LISTED XOBA, RED/WHT - BLK/WHT LEADS | 13 | | 13 |
| 533921 | PVM, SPR-A410-G-AC, AR-F1 M5.2 B1 | 31 | 1 Broken | 31 |
| 534278 | KIT, STANDARD METERING CT, PRODUCTION, PVS OUTDOOR | 8 | | 8 |
| 538341 | PVM, SPR-X22-360-E-AC, AR-H1 M5 B1 L 166A | 106 | | 106 |
| 538352 | PVM, SPR-M425-H-AC, AR-F1 M5.2 B2 | 87 | | 87 |
| 544319 | ROOF ATTACHMENT, OPEN SLOT, COMP SHINGLE, PEGASUS, BLACK | 282 | | 282 |
| 531575 | AC CONNECTOR, FIELD-MADE, FEMALE CONNECTOR, ENPHASE, EQUINOX | 16 | | 16 |
| 531702 | AC CONNECTOR, FIELD-MADE, MALE, ENPHASE, EQUINOX | 14 | | 14 |
| 531578 | AC TERMINATOR CAP, ENPHASE, EQUINOX | 1 | | 1 |

1st Pass: _[signature]_ Michael Ligi

2nd Pass: _[signature]_ Joshua Black